Filed 12/22/25  P. v. Fontes CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>PETERSON WILLIAM FONTES,<br><br>        Defendant and Appellant. | A171757<br><br>(Napa County<br>Super. Ct. No. 19CR001470) |

Peterson William Fontes was convicted by a jury of forcible sexual penetration by a foreign object (Pen. Code[1] § 289, subd. (a)(1)(A)) (two counts), second degree burglary (§ 459), and felony vandalism (§ 594, subd. (b)(1)).  He was sentenced in 2020 to an aggregate term of 16 years and eight months, including upper term sentences on the forcible sexual penetration counts.  In 2022, we affirmed Fontes's convictions but remanded for resentencing based on intervening changes in sentencing law.  Upon remand, the trial court reimposed the same sentence.

On appeal from resentencing, Fontes argues the court committed prejudicial error by reimposing the upper term sentences on the forcible

---

[1] All further statutory references are to the Penal Code.  Any discussion of jury findings in this opinion refers to factual findings made beyond a reasonable doubt.

sexual penetration counts based on, among other factors, two challenged aggravating factors under California Rules of Court, rule 4.421[2] that were not found true by a jury. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

The charges in this case stem from two separate incidents at outdoor festivals in 2019 in Napa County (Jane Doe 1) and Alameda County (Jane Doe 2). The prosecution's theory was that on each occasion Fontes cut holes in the walls of adjacent porta-potty units, surreptitiously watched through the holes as Jane Doe 1 and Jane Doe 2 urinated, and reached through the holes and penetrated their genitals with his fingers.

*Factual Summary*

The following summary is based on our previous opinions in *People v. Fontes* (Sept. 30, 2021, A159406, A162101) [nonpub. opn.] (*Fontes I*) and *People v. Fontes* (Jan. 26, 2022, A159406, A162101) [nonpub. opn.] (*Fontes II*) as the relevant facts are not in dispute.[3]

*Jane Doe 2 Incident*

"On May 12, 2019, Jane Doe 2 was working at a festival in Alameda County. That afternoon she left her booth to use one of three porta-potty units, specifically the larger handicapped unit. She pulled down her pants and underwear and squatted above the toilet with her hands on her knees. She felt something touching her posterior and at first thought it was her shirt, but then realized it was a hand. She looked between her legs and saw a pale, white hand that looked male. '[T]he hand was pretty much in [her] vagina like touching [her], grabbing [her].' She felt fingers on her labia. At

---

[2] All further rule references are to the California Rules of Court.
[3] We grant the Attorney General's unopposed August 14, 2025 request for judicial notice of the records in *Fontes I* and *Fontes II*. (Rule 8.252(a).)

2

the time the fingers were grabbing between '[her] vaginal lips,' '[i]t was definitely discomforting. It was . . . a lot of pressure.' The hand was '[s]queezing' and the fingers were 'wiggly.' She 'freaked out,' could not believe there was a hand, felt scared, and did not feel like she could move – she felt like she 'got stuck.' She screamed, jumped up, 'peed all over' herself, pulled up her underwear, and got out of the bathroom. She felt 'scared,' '[c]onfused,' '[n]ervous,' and '[e]mbarrassed.' After she screamed, the hand disappeared 'back into the hole it came from.' She was 'rattled,' felt 'a tightness in [her] chest,' and her 'head started hurting.' The touching lasted 'three seconds.' The incident lasted 'no more than 20 seconds' from the time she pulled down her pants to when she pulled them up. Once outside, Jane Doe 2 did not see anyone running but the people outside told her that they had seen someone run behind the porta-potty unit and down the street. [¶] . . . [¶]

"Alameda Police Officer Eric McKinley met with Jane Doe 2 at the police station one block from the festival. Visibly shaken, voice unsteady, and eyes puffy and watery as if she had been crying, Jane Doe 2 explained that a hand touched her genitalia as she was urinating in a porta-potty unit. She initially estimated she was touched for three seconds, but then said it was two seconds.

"Officer McKinley walked to the festival and photographed the damaged porta-potty unit used by Jane Doe 2 and the damaged adjacent porta-potty unit; the units were 'set up against each other,' with a small gap of approximately three or four inches between the units; and the jury was shown photographs of the damaged units. There was a small four-side rectangular hole (six inches by five inches) in the wall of the unit used by Jane Doe 2, and there was also a small [three]-sided hole cut to operate as a flap in the wall of the adjacent porta-potty unit. The holes in the units 'were

in line horizontally, but vertically they were askew.'  However, the officer was able to see between the units when the flap was moved to reveal the hole in the porta-potty unit adjacent to the unit used by Jane Doe 2.  The holes appeared to have been cut by hand with a sharp object and were approximately one and one-half feet above the ground." (*Fontes II, supra*, A159406, A162101.)

*Jane Doe 1 Incident*

"On May 25, 2019, Jane Doe 1 attended a festival in Napa County. That evening, she entered the fifth porta-potty unit on the left bank of handicap units.  Because the unit was dark, she turned on her cell phone light.  She held her phone in her mouth, pulled down her underwear, hiked up her dress, squatted above the toilet seat, and started to urinate.  '[M]aybe two seconds' later, she saw that her stream of urine 'started to just spray everywhere.'  She looked down and felt something 'tap' or 'poke[] her vagina.'  The first poke was on her perineum.  She looked more closely and saw a hand facing palm up with the index finger and thumb pointed up and the remaining fingers curled into the palm.  The hand was clean, well-groomed, and belonged to a white man.  Jane Doe 1 felt a second tap on her perineum and then a finger was asserted into her vagina; she was able to describe the manner of insertion.  She quickly tried to grab the hand but could not do so.  Approximately seven seconds elapsed between when she felt her urine spray and when she tried to grab the hand.  She yelled and exited the unit while urinating; she yelled again for help and said someone stuck his finger in her vagina.

"Jane Doe 1 saw two security guards, but they were 'dismissive' of her complaint.  She showed the security guards the area behind the porta-potty units, which at approximately two feet wide was sufficient for someone to

4

shimmy behind the units. She then showed one of the security guards the hole in the porta-potty unit she had used and the hole in the adjacent unit. Similar to the holes cut at the Alameda County fair, Jane Doe 1 described the hole in her unit as rectangular, approximately six by eight inches, with straight edges that were 'meticulously cut,' and approximately one and a half feet above the ground, while the hole in the adjacent unit was similar but cut only on three sides so that it operated as a flap.

". . . After further investigation, festival employees discovered four additional porta-potty units had been cut with holes, for a total of eight units.

"Jane Doe 1 called 911 and Detective Brandt Keown responded to the call at the festival. Keown and Jane Doe 1 went to the police station, where they spoke for approximately one and one-half to two hours; he testified she was angry and frustrated as well as frightened. She described the incident as 'one touching' and as a 'poke.' After speaking with the officer, Jane Doe 1 was examined by nurse practitioner Kari Cordero who photographed abrasions in her genital area. Jane Doe 1 had a burning sensation in her vagina after the incident that lasted two days. Also, in attempting to grab the man's hand she strained her lower back and subsequently received chiropractic treatment for the pain. She saw a therapist every week for post-traumatic stress disorder and depression. Cordero testified that she found multiple abrasions in Jane Doe 1's perineum, which indicated blunt force trauma. The physical examination was consistent with Jane Doe 1's report of the assault." (*Fontes II*, *supra*, A159406, A162101.)

*Police Investigation*

"Following the May 25 assault on Jane Doe 1, the next day (May 26), festival manager [Michael] Marzulli arranged for the damaged porta-potty units to be repaired and patches were put over the holes. At approximately

5

9:00 p.m. Marzulli saw defendant slide out from behind the porta-potty area where Jane Doe 1 had been assaulted and exit through a break in the fence. Marzulli grabbed defendant by the arm, and asked him, '[w]hat are you doing back here?' Defendant said he was urinating. Marzulli noticed defendant did not have an admission wrist band for the festival. Defendant got aggressive and tried to leave, but Marzulli detained him.

"Defendant was transported to the Napa police department where he met with Detective Keown. A photograph of defendant was taken, and his hands were examined – they had some recent scratches and small cuts, but were otherwise well-cared for and clean. Defendant was described as five feet four inches tall and approximately 150 pounds. Keown later went to defendant's apartment, where he found a double-edged wallboard saw (serrated blade with teeth on both sides) and a flyer for a festival in Kern County.

"When the police detained defendant, he was found holding a Samsung Galaxy cell phone in his left hand. The police also recovered a key fob for a Lincoln vehicle that was later located and visible in the center console was an Apple iPhone. The police took custody of both cell phones. Dustin Dodd, an expert in cell phone and forensic analysis, testified he had prepared a report concerning the videos and digital photographs found on the phones. One cell phone's history included internet searches concerning the Alameda and Napa festivals, while the other cell phone had several fliers for the Napa festival. One cell phone also contained videos and digital photographs. The videos included women urinating with their genital areas exposed inside porta-potty units and a woman 'orally copulating a male in a porta-potty' unit at the very end of which defendant 'turns the phone around to stop the video and is captured briefly by the camera as he turns the phone around.' The digital

6

photographs included images of women urinating and a selfie photograph of defendant inside a porta-potty unit; all the media appeared to have been taken at the Napa and Alameda festival grounds between May 11 and May 25, 2019." (*Fontes II*, *supra*, A159406, A162101.)

*Fontes's Prior Uncharged Offense in Brazil*

"The prosecution also presented the testimony of Leonardo Silva, 'Chief of Police' of one of the over 30 police stations in Brasilia, Brazil. As Chief of Police, Silva managed the local police force and also had some 'judicial powers' including 'indicting suspects' and 'conducting interrogations.'

"On October 14, 2018, Silva questioned defendant concerning his conduct at an event in a city park. Defendant admitted he had damaged temporary portable 'chemical toilets' (the 'same' as porta-potty units), which were specifically designated for female use. Defendant said he was motivated to drill holes in the toilets after he had watched a video about watching women using toilets. When asked if his objective was to 'satisfy his lewdness,' defendant 'confirmed' that his objective was 'to satisfy his sexual desires.' However, defendant denied being able to see any women inside the toilets even though he had damaged six toilets and watched for 30 to 40 minutes. Defendant repeatedly said he was deeply ashamed and that it was the first time he had tried to view women urinating in portable units." (*Fontes II*, *supra*, A159406, A162101.)

*Procedural History*

In 2019, a jury convicted Fontes of two counts of forcible sexual penetration by a foreign object (§ 289, subd. (a)(1)(A)), one count of second degree burglary (§ 459), and one count of vandalism (§ 594). The jury was not tasked with finding whether any aggravating sentencing factors under rule 4.421 were true.

7

At Fontes's original sentencing in 2020, the trial court imposed an aggregate prison term of 16 years and eight months, comprised of consecutive upper terms of eight years for the sexual penetration counts and a consecutive eight-month term (one-third the midterm of two years) for the vandalism count; the burglary sentence was stayed under section 654. The court explained it was imposing the aggravated terms for the sexual penetration offenses based on its finding that four aggravating sentencing factors (rule 4.421(a)(1), (a)(3), (a)(8), & (b)(1)) applied.

On direct appeal in 2021, we affirmed Fontes's convictions and a victim restitution award to Jane Doe 1, but remanded for the trial court to award two additional days of presentence custody credits. (*Fontes I*, *supra*, A159406, A162101.) Our Supreme Court remanded the case to us to reconsider our decision in light of intervening changes to sentencing provisions in section 654 and section 1170, subdivision (b), effective January 1, 2022. In 2022, we vacated Fontes's sentence and remanded the matter to the trial court for resentencing under the new laws and for correction of the presentence credit calculations; in all other respects, the judgment was affirmed. (*Fontes II*, *supra*, A159406, A162101.)

Upon remand, the trial court conducted resentencing hearings and found the jury would have found true beyond a reasonable doubt the same four aggravating sentencing factors it previously relied upon to impose the upper terms. The court exercised its discretion to again impose the upper term of eight years on both counts of forcible sexual penetration, reimposed the previously imposed sentence of 16 years and eight months in prison, and awarded Fontes two additional days of presentence custody credit. Fontes appealed.

DISCUSSION

Fontes argues the trial court committed reversible error by reimposing the upper terms of eight years on each of the forcible sexual penetration counts based on its finding that the jury would have found true multiple aggravating factors. Specifically, he contends the court erroneously found the offenses involved a high degree of callousness (rule 4.421(a)(1)) and that he engaged in violent conduct indicating a serious danger to society (rule 4.421(b)(1)). We are not convinced.

Pursuant to the amended version of section 1170, effective January 1, 2022, the trial court is generally required to impose a sentence "not to exceed the middle term," except "when there are circumstances in aggravation of the crime that justify the imposition of a term of imprisonment exceeding the middle term and the facts underlying those circumstances have been stipulated to by the defendant or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial." (§ 1170, subd. (b)(1) & (2); c.f. *id.*, subd. (b)(3) [though not relevant here, the jury trial requirement does not apply to a defendant's prior convictions based on a certified record of conviction].)

In *People v. Lynch* (2024) 16 Cal.5th 730 (*Lynch*), the California Supreme Court held that the amended version of section 1170 implicates a defendant's Sixth Amendment right to have any fact that may result in a greater potential sentence found by a jury beyond a reasonable doubt: "[A] Sixth Amendment violation occurs when the trial court relies on unproven aggravating facts to impose an upper term sentence, even if some other aggravating facts relied on have been properly established." (*Lynch*, at p. 768; see *Cunningham v. California* (2007) 549 U.S. 270, 281.) However,

any such error is subject to harmless error review.  (*Lynch*, at pp. 749–750, 768.)

The California Supreme Court summarized the *Lynch* harmlessness standard in a subsequent case: "When a defendant is deprived of a jury trial on aggravating facts used to justify imposition of an upper term sentence, the reviewing court must apply the *Chapman* [*v. California* (1967) 386 U.S. 18] standard of review.  [Citations omitted.]  Under that standard, 'a sentence imposed under . . . section 1170(b) must be reversed and remanded *unless* the reviewing court concludes beyond a reasonable doubt that a jury, applying that same standard, would have found true all of the aggravating facts upon which the court relied to conclude the upper term was justified, or that those facts were otherwise proved true in compliance with the current statute.' " (*People v. Wiley* (2025) 17 Cal.5th 1069, 1087 (*Wiley*), quoting *Lynch, supra,* 16 Cal.5th at p. 743, italics added.)  Stated another way, the error is harmless unless " 'the record contains evidence that could rationally lead to a contrary finding' with respect to the aggravating fact at issue." (*Wiley*, at p. 1087.)

As explained below, we conclude Fontes has failed to show that reversal is required under this standard.

## I.  Additional Background

Prior to resentencing, Fontes filed a sentencing statement requesting the court impose the low term of three years for each count of forcible sexual penetration.  Fontes argued the jury had not found true any aggravating factors, rendering the previous upper term sentence illegal under the new sentencing laws, and asserted the low term was warranted based on his significant history of childhood trauma and abuse.

10

The prosecution filed a statement of aggravation seeking reimposition of the original sentence, arguing the evidence showed beyond a reasonable doubt multiple aggravating factors would have been found true by a jury and that those factors far outweighed any mitigating circumstances.

On September 20, 2023, the first part of the resentencing hearing took place. The court continued the hearing and allowed the parties to file supplemental briefing.

In the supplemental briefing, Fontes objected to the court's reliance on those aggravating factors as there was no jury trial on the supporting facts and argued the court could not conclude a jury would have found those factors true because they are vague. Fontes also argued the factors would not compel imposition of the upper term sentences even if found true. The prosecution argued the harmless error standard announced in *Lynch* was satisfied because the jury would have found true all aggravating factors relied upon by the trial court to impose the upper terms on the forcible sexual penetration counts at Fontes's original sentencing.

On September 12, 2024, the trial court resumed the resentencing hearing. Jane Doe 1 made a victim impact statement explaining that Fontes's sexual assault completely changed her life, causing depression, trauma, and back pain. She noted his conduct targeted people in their most vulnerable state and, given his history of such conduct, nothing would stop him from recommitting the acts if he were released earlier. Counsel reiterated the arguments they had made in their pleadings.

The court concluded the jury would have found four aggravating circumstances true, two of which are challenged by Fontes on appeal.

First, the court found the jury would have found true that Fontes used a high degree of callousness when committing both sexual assaults (rule

4.421(a)(1)). The court reasoned the nature of the attacks was "so random and so callous" and involved acts worse than necessary to commit the crimes. Further, they were committed in a porta-potty at a music festival, where the victims were in "such a vulnerable state" and where Fontes had masked the attacks so as to leave the victims guessing whether the attacks even occurred.

Second, the court found the jury would have found beyond a reasonable doubt that Fontes's conduct indicated a serious danger to society: "[T]his is the type of conduct that puts everyone in society at risk. Particularly, anyone that used the restrooms. [¶] This isn't just an individual risk to Jane Doe One and Jane Doe Two. This is a danger at any time that people gather together." (Rule 4.421(b)(1).)

Not challenged by Fontes here, the court also found the jury would have found true beyond a reasonable doubt that the victims were particularly vulnerable (rule 4.421(a)(3)) and that the offenses involved significant planning or sophistication and professionalism (rule 4.421(a)(8)).

The court considered factors in mitigation, including Fontes's abusive childhood, his self-diagnosed sexual deviancy, and his success as an adult university student, pastor, and radio host. The court found no applicable mitigating factors related to the offense and that any such factors that might apply were outweighed by the aggravating factors.

The court found the aggravating factors in each forcible sexual penetration count outweighed the mitigating circumstances such that the imposition of the lower term would be contrary to the interest of justice. Further, and more pertinent for our purposes, the court found the aggravating factors that would have been found by a jury were "so great" that imposition of the upper terms on the two forcible sexual penetration counts

12

was warranted. Thus, the court reimposed the original sentence comprised of consecutive eight-year terms on the forcible sexual penetration counts, a consecutive eight-month term (one-third the midterm) on the vandalism count, and a stayed sentence on the burglary count, but awarded two additional days of custody credit.

## II. Fontes Fails To Show the Court Prejudicially Erred by Imposing the Upper Terms on the Forcible Sexual Penetration Counts

The trial court violated Fontes's Sixth Amendment right by reimposing the upper terms based on aggravating factors—that the offenses involved a high degree of callousness and that Fontes engaged in violent conduct indicating a serious danger to society—not found true by a jury or stipulated to by Fontes. (*Lynch*, *supra*, 16 Cal.5th at p. 768.)

However, the court did not *prejudicially* err by relying on these aggravating factors to impose the sentences. We address each challenged factor in turn and conclude a jury would have found both factors true and, thus, reversal is not warranted. (See *Wiley*, *supra*, 17 Cal.5th at p. 1087.)

### A. High Degree of Callousness

Fontes contends the court erred by finding that a jury would have found true that the forcible sexual penetration offenses involved a high degree of callousness under rule 4.421(a)(1), which applies where "[t]he crime involved great violence, great bodily harm, threat of great bodily harm, or other acts disclosing a high degree of cruelty, viciousness, or callousness."

Although callousness is not defined in rule 4.421, the pertinent jury instruction, CALCRIM No. 3224, provides that "[a]n act discloses callousness when it demonstrates a lack of sympathy for the suffering of, or harm to, the victim[s]" (italics omitted) and that the prosecution must prove the defendant's conduct was distinctively worse than an ordinary commission of

the underlying crime. The generic definition of the offense is "an act of sexual penetration when the act is accomplished against the victim's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim." (§ 289, subd. (a)(1)(A).)

The court's reliance on this factor to impose the upper term sentences was not reversible error because we conclude the jury would have found the forcible sexual penetration offenses involved a high degree of callousness. (See *Wiley*, *supra*, 17 Cal.5th at p. 1087.) Put bluntly, the victims had entered individual porta-potty units and exposed their genitals to use the facilities. After squatting above the toilet and while apparently alone, they were viewed and groped. Any reasonable juror would have found the shocking, unexpected, and embarrassing way the offenses were committed in this case demonstrated a lack of sympathy for the suffering of Jane Doe 1 and Jane Doe 2 that was worse than sexual penetration by force, violence, duress, menace, or fear of harm *alone*. (See CALCRIM No. 3224; § 289, subd. (a)(1)(A).)

As the trial court noted, the offenses involved attacking victims, seemingly at random, who were in a vulnerable state while they attempted to use a porta-potty during a music festival. Though the nature of the event is not itself determinative, there is a particular lack of sympathy involved in targeting the victims who were using a restroom in public, where they thought they could be vulnerable and safe, having exposed themselves in what they believed was privacy, only to have their genitals touched by Fontes's hand sticking through holes in the walls as they urinated. This stands in contrast to a generic commission of the offense, which could occur anywhere and without the victims dropping their guards in such a way, left to run out in public screaming for help after urinating on themselves. To

14

make matters worse, and as the court found, the victims were left guessing whether the attacks even occurred as they felt a hand grasping them yet saw no one else in the porta-potties with them. It is not difficult to imagine the shock and bewilderment one would feel in such a situation, compounding the suffering already experienced from the sexual assault.

We therefore conclude that, under the circumstances present here, any reasonable juror would find Fontes's acts—targeting, surprising, and embarrassing these unguarded, unprotected victims who thought they could be vulnerable in a public restroom—surpass the bar of conduct that "is typically defined as 'insensitive; indifferent; unsympathetic' [citation omitted], as in '*a callous indifference to the suffering of others*'" and were distinctively worse than an ordinary commission of the crime. (*People v. Esquibel* (2008) 166 Cal.App.4th 539, 558 [defining callousness in analyzing rule 4.421(a)(1)].) As there is no evidence that could rationally lead to a contrary finding, the court's reliance on this aggravating factor was harmless error. (*Wiley*, *supra*, 17 Cal.5th at p. 1087; see *Esquibel*, at p. 558 [no prejudice where jury would have found factor applied because "it takes a high degree of callousness to engage in" a shooting against "a group of vulnerable people who were unguarded, unprotected and defenseless"].)

Moreover, although the trial court mentioned great bodily harm in relation to this factor, and Fontes devotes a significant portion of the arguments in his opening brief to asserting the offenses did not involve great bodily harm, the transcript makes clear the court found the factor applied because "the jury would have easily found the 4.421(a)(1*) high degree of callousness* beyond a reasonable doubt." (Italics added.) As a finding of a high degree of callousness is alone sufficient to warrant application of the

15

factor (see *People v. Duran* (1982) 130 Cal.App.3d 987, 990), we do not reach Fontes's arguments related to great bodily harm.

In sum, the court's reliance on this factor to impose the upper term sentences was not prejudicial error.

### B.  Danger to Society

Fontes challenges the court's finding that he engaged in violent conduct indicating a serious danger to society (rule 4.421(b)(1)) on the sole basis that, "while the resentencing court permissibly found [he] . . . engaged in violent conduct, it erred in failing to consider his quasi-inevitable deportation from the United States" upon completion of his sentence when assessing his dangerousness.  We are not persuaded.

Even if Fontes's convictions for forcible sexual penetration render him statutorily subject to deportation upon release (a question we need not and do not reach), we reject his assertion that his potential deportation means a jury would not find beyond a reasonable doubt that he is a serious danger to society.  Fontes points to no authority indicating a factfinder is even permitted, let alone should, consider possible deportation consequences, and we have found no such authority.

Instead, Fontes's argument rests almost exclusively on *United States v. Quinones-Estrada* (S.D.Cal., Sept. 24, 2015, No. 15CR225 WQH) 2015 WL 5675429, in which a defendant convicted of forcible sexual penetration was subject to deportation and ordered removed from the Unites States after serving his sentence.  (*Id.* at pp. *1–2.)  Fontes apparently cites that case for the proposition that his forcible sexual penetration convictions render him removable from the United States under federal immigration law.

However, the potential for federal removal proceedings is not relevant to the well-supported finding of Fontes's dangerousness to society given the

16

evidence presented of his repeated sexual assaults under similar circumstances in both the Unites States and Brazil. (See CALCRIM No. 3234 [in assessing dangerousness under rule 4.421(b)(1), jury may consider defendant's conduct before or after commission of the crime as well as evidence about defendant's background].) Further, nothing in the rule is expressly limited to dangerousness to society in the United States. Even if it were limited to society in the United States, we note the defendant in *Quinones-Estrada* subsequently returned to the United States (through some unexplained manner) and so deportation is no guarantee of no future danger to domestic society.

Accordingly, Fontes fails to show that the court committed reversible error by relying on this aggravating factor.

## DISPOSITION

The judgment is affirmed.

17

PETROU, J.

WE CONCUR:

TUCHER, P. J.

FUJISAKI, J.

A171757 / *People v. Fontes*

18